1

2  UNITED STATES BANKRUPTCY COURT

3  DISTRICT OF DELAWARE

4  Case Nos. 08-12264 (CSS) and 08-12265 (CSS)

5  - - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7  AMC INVESTORS, LLC,

8           Debtor.

9  - - - - - - - - - - - - - - - - - - - - -x

10  In the Matter of:

11  AMC INVESTORS II, LLC,

12           Debtor.

13  - - - - - - - - - - - - - - - - - - - - -x

14                  U.S. Bankruptcy Court

15                  824 North Market Street

16                  Wilmington, Delaware

17

18                  May 31, 2011

19                  2:07 PM

20

21  B E F O R E:

22  HON. BRENDAN L. SHANNON

23  U.S. BANKRUPTCY JUDGE

24

25  ECR OPERATOR:  LESLIE MURIN

1

2    HEARING re Eugenia VI Venture Holdings, Ltd.'s Motion for

3    Standing to Assert Estate Claims.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Pnina Eilberg

1

2  A P P E A R A N C E S :

3  GIBSON DUNN & CRUTCHER LLP

4       Attorneys for Debtors

5  BY:   MITCHELL A. KARLAN, ESQ.

6

7

8  STEVENS & LEE P.C.

9       Attorneys for Debtors

10  BY:   MARIA APRILE SAWCZUK, ESQ.

11

12

13  AKERMAN, SENTERFITT & EDISON, P.A.

14       Attorneys for Debtors

15  BY:   BRIAN MILLER, ESQ.

16

17

18  RICHARDS, LAYTON & FINGER, P.A.

19       Attorneys for Eugenia VI Venture Holdings, Ltd.

20  BY:   MARCOS A. RAMOS, ESQ.

21

22

23

24

25

1

2   COOCH & TAYLOR P.A.

3         Attorneys for Chapter 7 Trustee

4   BY:   DALE R. DUBE, ESQ.

5         GEOFFREY L. BURTCH, ESQ.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   P R O C E E D I N G S

2          THE CLERK:  All rise.

3          THE COURT:  Please be seated.  Good afternoon.

4          IN UNISON:  Good afternoon, Your Honor.

5          MR. RAMOS:  Your Honor, for the record Marcos Ramos,

6    Richards, Layton & Finger on behalf of Eugenia VI Venture

7    Holdings.

8          We're here today on an amended notice of agenda that

9    we filed just this past Friday.  Does Your Honor have a copy?

10         THE COURT:  I do.

11         MR. RAMOS:  Great.  Per the agenda, the only matter

12   going forward is Eugenia's motion for standing to assert estate

13   claims.  The Chapter 7 Trustee did file a limited objection and

14   the debtors, of course, filed a combined objection.

15         THE COURT:  I have received and reviewed both.

16         MR. RAMOS:  Excellent.  Before proceeding, Your Honor,

17   we wanted to thank you for sitting today to hear the motion.

18         THE COURT:  I'm happy to oblige.  I'm here in the high

19   rent district, although I thought they had air conditioning

20   down here on the bottom.  They don't cover us for that on six

21   but anyway I think we'll make due.

22         MR. RAMOS:  Thank you, Your Honor.  Your Honor, I'd

23   like to introduce Mr. Mitchell Karlan of Gibson Dunn &

24   Crutcher.  He is admitted in these proceedings and will be

25   addressing the court.

AMC INVESTORS, LLC

1          THE COURT:  Very well.  I'm familiar with Mr. Karlan.

2    Good afternoon, sir.

3          MR. KARLAN:  Good afternoon, Your Honor.

4          Your Honor's read the papers so you already know what

5    I'm about to say, which is that were it not for the statute of

6    limitations issue we certainly would have waited for Judge

7    Sontchi.

8          THE COURT:  Sure.  And that's fine; I have no problem

9    with that.

10         MR. KARLAN:  Okay.  Your Honor, this is a motion for

11   permission by the debtor's largest and, I think, probably only

12   creditor for permission to bring an adversary proceeding

13   against five defendants on behalf of the two debtors.  The

14   Chapter 7 Trustee, with the exception of some technical issues,

15   as I gather, supports the application.

16         The test, as Your Honor knows, if Cybergenics applies

17   in a Chapter 7 --

18         THE COURT:  Yeah, let's talk about that.  Why don't we

19   start with that?

20         MR. KARLAN:  Okay.

21         THE COURT:  That's an interesting question.

22         MR. KARLAN:  Okay.  If Cybergenics applies in a

23   Chapter 7 case, I don't perceive any meaningful argument here

24   that we have not met Cybergenics.  The trustee certainly agrees

25   that we have and the only objection comes from the counsel for

1    the debtors, a party whose interest in this motion is not

2    altogether clear to me, certainly not clear to me why they

3    would be opposing it.

4         The debtors -- the prepetition debtors certainly have

5    no continuing interest in this.

6         THE COURT:  Well I think as I read the -- as I read

7    the objection on the debtors primarily it raises an interesting

8    question, which I had never really thought about.  Obviously we

9    deal with Cybergenics regularly in the context of a Chapter 11

10   case and their argument is that it has peculiar or perhaps

11   specific application exclusively to Chapter 11, given the

12   nature of a debtor in possession rather than a trustee in most

13   Chapter 11 cases.  And the statutory authority and fiduciary

14   capacity of a committee and that those considerations don't

15   apply.  And as I read their papers I think that says they then

16   extend the argument to say, so accordingly derivative capacity,

17   at least as identified or contemplated under Cybergenics,

18   should not apply in the context of a Chapter 7.

19        MR. KARLAN:  Judge, here's the reality.  This estate

20   has no money and if it did I think there is -- I think Your

21   Honor can infer from the trustee's papers that derivative

22   standing might not needed -- we might not have needed to have

23   sought it.  But to cut to the chase, Your Honor, the

24   Cybergenics court, as I read the opinion, did not, at the end

25   of the day, base its decision on any language specific to

Page 8

1    Chapter 11 as opposed to Chapter 7, but rather on the equitable

2    power of the bankruptcy court, which obviously exists, if not

3    equally perhaps even more so in a seven.

4            The movants here are the only parties, the only real

5    parties in interest in this case.  And this lawsuit may or may

6    not be the only asset of this estate; it appears to be the only

7    asset we can find of this estate.

8            THE COURT:  Right.

9            MR. KARLAN:  And there was, as Your Honor may have

10   detected from the papers, a lot of litigation at the outset of

11   this involuntary about whether the case should proceed at all.

12   The objectors today, at that time, objected to the whole case

13   going forward.  But the case was permitted to go forward.  We

14   were given the right to take some discovery.  There was a

15   substantial amount of stonewalling, which is why we took so

16   long to get this complaint on file.  We never did finish all

17   the discovery that we were supposed to get, and I guess we'll

18   just get that in the adversary.

19           But I can't detect, in the opinion of Cybergenics, any

20   rationale, any language that points to a rationale that would

21   lead a court to conclude, correctly, that derivative standing

22   of this sort only applies in an 11 as opposed to a 7.  Clearly,

23   outside of bankruptcy, we would have standing to bring this

24   derivative claim, under Delaware law.

25           In addition, Your Honor, and obviously because of the

1    holiday weekend we don't have a fifty-page brief for you.

2           THE COURT:  Try to imagine my disappointment.

3           MR. KARLAN:  But I do have some case cites, which I

4    can either read to you or put in a letter to you or both, which

5    support our view that Cybergenics does have application in a --

6           THE COURT:  What are your cites?

7           MR. KARLAN:  Okay.  2010 -- the name of the case,

8    Judge, is In re Mou San, M-O-U S-A-N R-I-M, that's a man's

9    name, three words Mou San Rim, 2010 Westlaw 4615174, and that's

10   from the -- that's a district court case in the District of New

11   Jersey, not a bankruptcy court case, from 2010.

12          In re Godon, Inc., G-O-D-O-N, Inc.  275 B.R. 555 and

13   the jump cite there, Your Honor, is -- I liked it better when

14   we had books.  It's headnote 28.

15          THE COURT:  Okay.

16          MR. KARLAN:  And that is from the Eastern District of

17   California, 2002.  In re Parmetex, P-A-R-M-E-T-E-X, 193 F.3d,

18   page 1029 at headnotes 1 and 2 and that is from 1999, the Ninth

19   District Court of Appeals.  Eighth District Court of Appeals,

20   2008, In re Racing Services, Inc., 540 F.3d, 892 at headnote 3

21   and if I didn't say it that's 2008.

22          THE COURT:  Okay.  Thank you.

23          MR. KARLAN:  And lastly, Judge, Sixth Circuit Court of

24   Appeals, In re Trailer Source from 2009, 555 F.3d 231 and that

25   is at headnote 2.

1              THE COURT:  Okay.  Thank you.  All right.  Well,

2      assuming that Cybergenics has functional application in a

3      Chapter 7 context, then we're talking about the Cybergenics

4      standard, right?

5              MR. KARLAN:  Yes.

6              THE COURT:  We're talking about a colorable claim.

7              MR. KARLAN:  Yes.

8              THE COURT:  Failure to prosecute or consent and then

9      leave of bankruptcy court.

10             MR. KARLAN:  Right.  And the only -- well, obviously

11     leave of bankruptcy court we don't have.  The only issue, I

12     think, at this point that's raised by the pre-petition debtors

13     is whether or not these defendants, who may or may not be

14     represented by the same law firm, I don't know, will have

15     excellent defenses when the adversary is filed.  A, statute of

16     limitations; B, collateral estopple.

17             THE COURT:  Right.

18             MR. KARLAN:  And C, in pari delicto.  Judge, I'm happy

19     to address all of those if you want me to but if I might just

20     start by saying that I would respectfully suggest that this is

21     not the time for a detailed presentation or argument on any of

22     those issues.  They're clearly complicated.  I can refer,

23     briefly, to some of the reasons why they're complicated.

24             THE COURT:  Why don't we walk through them just so

25     that I understand?

1          MR. KARLAN:  Okay.  Sure.

2          THE COURT:  I'm not asking -- I have been through them

3    carefully and I've read your papers as well and I've looked at

4    the draft.  And -- so we can walk through them.

5          MR. KARLAN:  Okay.

6          THE COURT:  But one question that I've often wondered

7    or, frankly, noodled about, having dealt with this in other --

8    in the 11 context is, as I read the colorable claim, the case

9    law construing that, the test is framed, usually, in the

10   12(b)(6) language, you know,  Is it a colorable claim?  Is

11   this -- is there a claim?  Is there something you can sue over?

12   And which has led me to wonder, and you don't need to start

13   here but I'd like you to finish with it.

14         MR. KARLAN:  Okay.

15         THE COURT:  Which has led me to wonder, if I were to

16   grant a motion for leave for standing, does that functionally

17   foreclose a 12(b)(6) motion at a -- you know, at the next

18   stage?

19         MR. KARLAN:  I want to start there, if I may?

20         THE COURT:  Sure.

21         MR. KARLAN:  Because that's actually where I was --

22   when I said this isn't the time or the place, that's -- that is

23   exactly what I meant.  We are not suggesting, remotely, that

24   Your Honor should, in granting our motion, say anything

25   negative or positive about these three defenses that are

1    previewed in these objecting papers.  We fully expect that they

2    will be vigorously raised in a motion to dismiss or a motion

3    for summary judgment, whichever is appropriate or both.  And

4    that they will be litigated, perhaps after extensive discovery

5    which I think is going to be needed on some of them.

6         I would suggest, Your Honor, that the standard

7    colorable claim is not like the Rule 12(b)(6) standard but is

8    more like the Rule 15 standard, where a party moves to amend

9    the complaint and there is case law to the effect that an

10   amendment that is futile should be denied.  But that is a

11   really, I don't want to say high or low, I'm not sure which.

12   That is a hard standard for the --

13        THE COURT:  It's at some end of the spectrum.

14        MR. KARLAN:  -- objecting party to meet.  And when a

15   court says no it's not futile, go ahead and make the amendment,

16   that doesn't foreclose the defendant in the amended complaint

17   from moving to dismiss or anything else and I would, not for a

18   moment, suggest that any of the defendants here, who are not

19   even represented today, are going to be foreclosed from

20   anything.

21        Let me just say a word about the prior litigations

22   here, because I think they are the factual premise for the

23   collateral estopple argument, and I think this is a complicated

24   story, even for those of us who, like Mr. Miller and myself,

25   who have been living this for six years.  I can't even imagine

1   how hard this is for Your Honor on a seventy-two hour basis.

2          THE COURT:  I had a holiday weekend.

3          MR. KARLAN:  We -- there are three litigations that is

4   important, I respectfully suggest, to keep independent in our

5   minds when thinking about the collateral estopple argument.

6   The first is, what I will call, the New York federal action.

7   In the New York federal action Eugenia, the movant here, was

8   the plaintiff.  And the defendants in that case were a variety

9   of entities and individuals, including two of the potential

10  defendants here, Mr. Glazer and Mr. Rial (ph.).

11          In that case Eugenia sued, in its capacity as lender,

12  to a company called AMC Computers, Inc., which is not a debtor

13  here, not a creditor here and not a prospective defendant in

14  the adversary proceeding.

15          Eugenia had made a loan, a series of loans, to AMC

16  Computers, Inc.  AMC Computers, Inc. had become insolvent and

17  had been liquidated under state law, it never had a federal

18  bankruptcy proceeding.  And Eugenia brought a fraud action

19  against, among others, Mr. Rial and Mr. Glazer, alleging that

20  they had defrauded Eugenia into extending the loan to the

21  computer company.

22          There was also a second count; I'm a little bit

23  oversimplifying this.

24          THE COURT:  I understand.

25          MR. KARLAN:  We'll be okay with it.  There was a

1    second family of counts in the federal case that were breach of

2    fiduciary duty actions, claims, where Eugenia was suing

3    derivatively on behalf of what I'm going to keep calling the

4    computer company because I don't want mix it up.  They have

5    similar names and I don't want to mix it up with the debtors

6    here.  Suing derivatively on behalf of the computer company

7    saying that Mr. Rial and Mr. Glazer and others breached their

8    fiduciary duties to the computer company.  Okay?

9            THE COURT:  Okay.

10           MR. KARLAN:  The holdings -- we did not prevail with

11   respect to either or those two claims for the following

12   reasons.  On the fraud claim, as Your Honor is probably aware,

13   under New York law, which governed, the measure of damages for

14   fraud is substantially different than the measure of damages

15   for breach of contract.  It's limited to actual out-of-pocket

16   loss, as opposed to the benefit of the bargain, which is the

17   contractual measure of damages.

18           THE COURT:  Expectation damages and the like.

19           MR. KARLAN:  Right.  Because we were not suing the

20   computer company, which had long since become defunct, but

21   we're rather suing these third parties for fraud, the court

22   held, on a motion for summary judgment, that we had already

23   recovered all of our principal and were only now seeking to

24   recover accrued and unpaid interest.  And that under a fraud

25   theory we were not entitled to do that, rather we had already

1    gotten back our out-of-pocket loss.

2           On the breach of fiduciary duty theory, the court

3    ruled that in 2003, when the loan was very first extended to

4    the computer company by Eugenia, the computer company was

5    already insolvent and so Eugenia could not bring a derivative

6    claim alleging that the computer company suffered when Rial and

7    Glazer drove it into insolvency.  The court held, no it was

8    already insolvent by the time they made the loan in 2003.

9           THE COURT:  Okay.

10          MR. KARLAN:  Okay.  Respectfully, we don't think that

11   that action has the slightest relevance to anything that's

12   going on in this court, and I'll explain more in a moment why.

13   Let me talk about the second of the three actions that Your

14   Honor needs to bear in mind, and that's what I call the

15   guarantor action.

16          The two debtors in this case issued unconditional

17   guarantees to Eugenia, the lender, promising to repay the

18   entire amount of the loan proceeds, under the loan agreements,

19   in the event that the computer company failed to pay, which the

20   computer company did fail.

21          There was an action in New York State Court against

22   these two debtors, by Eugenia, under the guarantee, a simple

23   breach of contract action.  The debtors, who were represented

24   by Mr. Miller, did not deny liability but did contest damages

25   and so we had a trial on damages, I believe lasted two days,

1    and the judge wrote an opinion and the judge --

2              THE COURT:  I read the opinion.

3              MR. KARLAN:  -- requested for ten or twelve million, I

4    forget the number, million dollars.  That was taken up on

5    appeal to the appellate division in New York and while that

6    appeal was pending this involuntary was filed.

7              This -- what I call the third action is the action we

8    wish permission to bring now.  The most important thing about

9    the third action, for purposes of collateral estopple analysis,

10   is that Eugenia is only a derivative plaintiff.  The plaintiffs

11   here would be the guarantors, the debtors.  So to the extent

12   that Eugenia has, in the past, suffered any adverse rulings

13   they would not, under collateral estopple, have any application

14   here where the plaintiff -- plaintiffs would be the debtors.

15             Second, while it is true that in the interest of

16   economy we borrowed heavily from the language of the earlier

17   complaints, seeing no need to completely reinvent the wheel,

18   the theories here are completely different.  The theory in the

19   prospective complaint is that these defendants, including

20   Glazer and Rial, breached their fiduciary duties not to the

21   computer company but to the guarantors.  And among the other

22   kinds of harm suffered by these debtors as a -- at the hands of

23   Rial and Glazer, is that these debtors suffered a twelve or

24   whatever million dollar judgment in what I call the guarantor

25   action.

Page 17

1          THE COURT:  Okay.

2          MR. KARLAN:  So I don't believe -- I don't understand

3     the collateral estopple argument and I don't believe that that

4     will be well taken in on a motion to dismiss or a motion for

5     summary judgment.  But again, I don't ask Your Honor to make

6     any rulings about that.

7          As far as the statute of limitations goes, the date of

8     the judgment was well within the statue of limitations claimed

9     by the objectors here and we don't believe that will be well

10    taken.

11         The in pari delicto issue, which I suspect Your Honor

12    is more familiar with, even than I am, is way complex.  We

13    think there are going to be sole actor issues here.  We think

14    there are going to be adverse interest exceptions here, as Your

15    Honor knows the in pari delicto defense does not apply where

16    the alleged bad guys were acting in their own best interest and

17    essentially embezzling money from -- from the debtor/company.

18    And that is, I think, the kind of case we're going to present

19    here.

20         So that's a preview.  Mr. Miller's given a preview.

21    I'm happy to give a preview but I just don't think today's the

22    day for these unbelievably complicated issues to get resolved.

23    If Mr. Miller's right all we're asking to do today is to save

24    the statute of limitations, I shouldn't even say that.  Save my

25    argument on the statue of limitations, he'll still have his

1    argument, and we'll -- and we'll litigate that, along with

2    these other issues, maybe even before you.

3              Unless Your Honor has questions for me I'm --

4              THE COURT:  No, I don't think I have questions right

5    now.

6              MR. KARLAN:  Thank you, Judge.

7              THE COURT:  Okay.  Response?  Ms. Sawczuk.

8              MS. SAWCZUK:  Good afternoon, Your Honor.  Maria

9    Sawczuk on behalf of the debtors.  Your Honor, with me is Brian

10   Miller from Akerman Senterfitt.  He's been admitted pro hac

11   vice in this matter --

12             THE COURT:  Right.

13             MS. SAWCZUK:  -- and will address the Court.

14             THE COURT:  Very good.  Mr. Miller, welcome.

15             MR. MILLER:  Thank you, Your Honor.

16             Your Honor, I think that fortunately or unfortunately

17   today is the day, if Your Honor needs to decide the issues of a

18   colorable claim under the statute of limitations and collateral

19   estopple items, despite what opposing counsel argued, unless

20   Your Honor agrees with us on the threshold issue, which is that

21   a creditor, such as Eugenia, does not have standing to bring

22   these type of derivative claims in a Chapter 7 proceeding, like

23   we are here today.

24             If Your Honor agrees with us on that point, which we

25   think --

1           THE COURT:  Let me ask you, and I realize that

2    Cybergenics was in the context of a Chapter 11 and so the Court

3    talked about, in the Third Circuit, talked about the principles

4    that would support application of derivative standing in a

5    Chapter 11 and they talked about an official committee, because

6    it was a Chapter 11 case and they had an official committee.

7    And they talked about the debtor in possession, because they

8    had a debtor in possession.  But I actually, you know, I'm

9    certainly pretty familiar with Cybergenics and I read it again

10   and I agree that it's a Chapter 11 case but I'm not certain

11   that I'm satisfied that its principle or the doctrine has

12   exclusive application.

13           And I guess in part the argument is that I should have

14   confidence, which I certainly do, in the Chapter 7 trustee and

15   that that should end the inquiry.  But I'm not certain that --

16   that Cybergenics or the principles of derivative standing are

17   predicated upon a lack of confidence in whatever entity or

18   party holds a claim, such that I need to get somebody else into

19   it.  I mean, there are circumstances that we've all seen that -

20   - where it's simply wisest to allow another party to pursue and

21   it's not necessarily predicated upon, you know, a wrongful

22   refusal or a lack of confidence.  And, I guess, to boil it

23   down, and I don't want to go too far afield, but to boil it

24   down, though, in the context of a Chapter 7, it seems to me

25   highly predictable that there may be a cause of action that a

1    trustee or an estate is simply not sufficiently funded to

2    pursue but that may have merit.  And we'll get to colorable

3    claim and all but, I mean, I'm just speaking of a hypothetical

4    case and why that shouldn't occur.

5            MR. MILLER:  Well first of all, the Cybergenics case,

6    I think we all agree, was a Chapter 11 case.  So the

7    Cybergenics case clearly does not stand for the direct

8    principle that a creditor may bring an action like this in a

9    Chapter 7 case.

10           THE COURT:  Agreed.

11           MR. MILLER:  I think we all would agree on that.

12           THE COURT:  Yeah.

13           MR. MILLER:  Also, we all know that the Cybergenics

14   opinion was a decision with four of the judges dissenting who

15   believed that under the Supreme Court's Hartford case that the

16   majority reached the incorrect result even in the Cybergenics

17   Chapter 11 context.

18           So I think that the reasoning outlined by the Court in

19   Cybergenics, by the majority under those circumstances and by

20   the dissent as to why the Court should not go too far in

21   allowing equitable grants of standing to creditors to bring

22   derivative cases, is exactly why Your Honor should not allow

23   the derivative proceeding to be brought here.

24           The statute, under a Chapter 11, grants specific

25   authority, specific statutory authority to creditors'

1    committees to bring claims.  There is no similar statutory

2    grant to creditors under Chapter 7.  Rather, under Chapter 7

3    the trustee, Mr. Burtch, who's in the courtroom today, is the

4    person empowered to investigate and to bring claims.  And Your

5    Honor, for a very comprehensive analysis of Cybergenics and

6    many other cases that discuss the issue of whether a

7    Cybergenics-type analysis should apply in a Chapter 7 case, I

8    direct Your Honor to In re Cooper, which was a Northern

9    District of Texas bankruptcy case.

10              THE COURT:  Yeah, I have it.

11              MR. MILLER:  I have an extra copy if Your Honor would

12   like to have it.

13              THE COURT:  Sure.

14              MR. MILLER:  May I approach?

15              THE COURT:  Yeah.  Thanks.

16              MR. MILLER:  And at page 812 of the Cooper case, I

17   think that there the court summed up, in this circumstance, why

18   it's not appropriate to allow a creditor standing to bring

19   derivative claims.  The court said, toward the bottom of page

20   812, and I'll give Your Honor a minute to get there.

21              THE COURT:  I'm there.

22              MR. MILLER:  I'm looking all the way at the very end

23   of page 812, the court said, "An experienced bankruptcy

24   trustee, unlike a potentially angry and out-for-justice

25   creditor, may have a better instinct for what is worth chasing

Page 22

1    and what is worth forgoing".

2         Your Honor, that's precisely the circumstance that we

3    face here.  We have an admittedly angry and out-for-justice

4    creditor that has been pursuing these people in various

5    litigations for the past six years, without any success.  Now

6    they want this Court to allow them to continue this vendetta

7    and continue trying to go after people under the same facts

8    where they have not had any success in the past.

9         THE COURT:  But I think the court -- I read -- I did

10   read the Cooper case this weekend and I'm not certain where it

11   is but the court, I think, in Cooper actually placed

12   significant weight on the fact that -- if this is -- I'm mixing

13   up the cases but if I've got it right, the court placed

14   significant weight on the fact that the claim was acquired

15   after the debtor's discharge, that it was almost, sort of, a

16   vehicle to pursue litigation and certainly, you know, I

17   don't -- I don't necessarily disagree with the proposition

18   you've just cited, which is that, you know, that the trustee

19   makes a dispassionate view of the economics of the analysis,

20   which is what I expect.  But I think I look at it and say,

21   first of all, I think I'd like to -- you to respond on Cooper,

22   one whether I've got it right, did they acquire it later or am

23   I --

24         MR. MILLER:  That is what I read in the case as well,

25   Your Honor.

1          THE COURT:  Okay.  Which at least, for me sitting,

2    again, that would set off all kinds of bells because that's

3    closing on champorty (ph.)and maintenance and the sale and

4    transfer of causes of action, that's limited for various sound,

5    public policy reasons.  But in addition I think that we have

6    that concern, which I agree is legitimate.  But the second

7    piece is that the trustee makes a dispassionate determination,

8    primarily, I mean, to be candid, the trustee says am I supposed

9    to pursue complex commercial litigation on the come?  Do I --

10   can I engage counsel on a contingency basis if there is no

11   money in the estate?  And the trustee may say there's value

12   there but I'm not certain that I can, frankly, sell that to a

13   lawyer.  And does the Code preclude, for lack of a better

14   phrase, does the Code preclude a creative approach to perhaps

15   pursuing legitimate estate value?

16          And again, I will grant you that, you know, the

17   vendetta concern is certainly out there and I will -- I will

18   acknowledge that.  But, you know, it may be that -- that these

19   are, you know, remarkable or perhaps a little bit extreme facts

20   with the acquisition of the claim.  Is that fair?

21          MR. MILLER:  Your Honor, the case did address the fact

22   that the creditor there had acquired the cause of action, but I

23   don't think that was the sole basis for the court's decision --

24          THE COURT:  Agreed.

25          MR. MILLER:  -- that it only apply in a Chapter 11

1    context.  And I think that the -- there's no need for, as Your

2    Honor pointed out, a creative approach to bringing claims such

3    as Eugenia proposes in this case, where without any statutory

4    authority they asked the court to give them standing to bring

5    claims in a Chapter 7 case when a creative vehicle does and

6    could exist that is something that Judge Sontchi had alluded to

7    in previous hearings in this case, which is that the trustee,

8    Mr. Burtch, could, if these claims had merit, we obviously

9    don't believe they do and we'll get to that in a minute.  If

10   they had merit he could easily find somebody to bring these

11   claims on a contingent basis.  I think the fact that he hasn't

12   speaks volumes to the colorable claim issue.

13        Second, even leaving aside whether the trustee could

14   find a contingency lawyer to bring the case, the trustee

15   clearly has standing to bring these claims and he could be

16   financed by Eugenia if they were as gung-ho as they evidently

17   are in having somebody pursue these claims.  The trustee is

18   that dispassioned, independent third person with the estate's

19   best interest in mind who can look at this situation and

20   determine whether there's a claim worth bringing here and if so

21   what it should be worth.  He can do that funded by Eugenia.

22        And obviously we don't think that should happen,

23   because we don't believe any claims should happen here.

24        THE COURT:  Sure.

25        MR. MILLER:  But -- does Your Honor need a minute?

1          THE COURT:  No, I'm good.

2          MR. MILLER:  That sort of structure would be

3    particularly important here because the debtors' interests,

4    which is that this Court is looking out for, are not served by

5    having Eugenia bring these claims against anyone on behalf of

6    the debtors.

7          Why is that, Your Honor?  You heard some of the

8    background.  The reason why we're in bankruptcy court is

9    because Eugenia sued these debtors in state court, they

10   obtained a judgment, that judgment was on appeal to the

11   appellate division in New York State court, shortly before oral

12   argument was scheduled Eugenia filed this involuntary

13   bankruptcy staying the appeal.

14         The debtors have defenses to the judgment that is the

15   basis of this bankruptcy, that they will be able to bring

16   against Eugenia when the bankruptcy ends or the stay is lifted

17   in state court.  Eugenia, Your Honor, has a clear conflict of

18   interest in trying to bring claims on behalf of the debtors

19   when the debtors' interests, Your Honor, is actually to defeat

20   Eugenia in the State Court and either eliminate or reduce the

21   amount of the judgment and the debt that's owing to their sole

22   creditor.

23         THE COURT:  Let's talk for a second, then, about, I

24   think the other decision that you relied upon, well you've got

25   a couple but the -- Judge Steckroth's opinion in Hannah, In re

Page 26

1    Hannah from the District of New Jersey, a 2004 case.

2            MR. MILLER:  Yes, Your Honor.

3            THE COURT:  And again, you've cited it.  Clearly the

4    court precluded the debtor from pursuing -- I'm sorry -- well,

5    actually it was the debtor from pursuing, in a derivative

6    capacity, causes of action that were not being pursued by the

7    trustee.  And, I think, I guess as I look at it it's a slightly

8    different animal because it's looking to enforce the strong arm

9    protections of 544.  But it does -- but does it fairly stand

10   for the proposition that Cybergenics is limited to Chapter 11?

11           MR. MILLER:  Yes, Your Honor.  I believe it does.

12           THE COURT:  Okay.

13           MR. MILLER:  Because in that case, among other things,

14   at page 61, the court pointed out that, "However in a Chapter 7

15   or Chapter 13 case the trustee has a unique and defined role."

16   Then the court cited the Hartford Underwrites Supreme Court

17   opinion.

18           THE COURT:  Right.

19           MR. MILLER:  The court went on to say, "A trustee is

20   always in place and thus much of the rationale relied upon by

21   the Cybergenics court for holding that a committee of unsecured

22   creditors has standing in a Chapter 11 case to bring an action

23   under Section 544(b), is not applicable in a Chapter 7 or 13

24   case".

25           So Your Honor, I do believe that the Hannah decision

1   from the District of New Jersey Bankruptcy Court lends further

2   support to what we are arguing here, that Cybergenics is and

3   for policy and statutory construction reasons should be limited

4   to a Chapter 11 context.

5          THE COURT:  Okay.  I understand.  All right.  Let's

6   talk about colorable claim.

7          MR. MILLER:  Yes, Your Honor.  I think that Your Honor

8   does have to address whether the claims are colorable.  If Your

9   Honor believes that it needs -- that the Court needs to apply

10  the Cybergenics test.

11         And we have cited cases, and Your Honor has noted,

12  that a 12(b)(6) standard would apply.  I don't believe that

13  Eugenia has any authority, they haven't cited any authority,

14  that a Rule 15 standard should apply.  Instead, it is a motion

15  to dismiss standard that the court would apply.

16         Your Honor raised a very interesting question, which I

17  had not thought of before the hearing, as to whether your

18  ruling on colorable claim would preclude a further motion to

19  dismiss if Your Honor were to allow the case to go forward.  I

20  have not looked at that and have not researched it so I really

21  can't take any position on that today, Your Honor.

22         But I think it's clear, under these circumstances,

23  that the claim that Eugenia proposes to bring is not colorable

24  under a 12(b)(6) or any other standard.  And Your Honor, the

25  simplest reason is the one that Eugenia glossed over the most

Page 28

1    quickly, which is the statute of limitations.

2              Your Honor need look no further than paragraph 8 of

3    Eugenia's motion where Eugenia stated that in May 2005, May

4    2005 Your Honor, more than three years before this bankruptcy

5    case was filed Your Honor, Eugenia learned that AMC Computer

6    had engaged in fraudulent activity relating to its obligations

7    under the credit agreement and was insolvent.

8              So by Eugenia's own motion, Your Honor, they're

9    admitting that they knew of the facts giving rise to this

10   proposed cause of action in May 2005, yet they did not sue.  No

11   one sued.  Three years, which is the applicable Delaware state

12   law statute of limitations for breach of fiduciary duty went by

13   and no lawsuit was filed, no bankruptcy proceeding was filed.

14   The bankruptcy was not filed until September 2008, Your Honor,

15   more than three years after at least inquiry notice arose in

16   Eugenia's mind and therefore the claims were already barred by

17   the statute of limitations before this bankruptcy was

18   commenced.

19             And as a result, because the claims were barred,

20   Section 108, I believe it is, does not apply.

21             THE COURT:  Right.

22             MR. MILLER:  Because the claims were already barred

23   from the statute at that point in time.  That's the clearest,

24   simplest reason, Your Honor, why you can conclude that this is

25   not a colorable claim.

AMC INVESTORS, LLC

Page 29

1          Not only does Eugenia allege in its motion that it was

2    aware of these facts in May 2005, it sued people under the same

3    facts in June of 2005.  And then in August of 2005, again more

4    than three years before the bankruptcy, Eugenia sued Mr. Glazer

5    accusing him of breach of fiduciary duty in connection with

6    actions at AMC Computer, which are the exact same facts that

7    they proposed to sue Mr. Glazer on again now.

8          This is very similar, Your Honor, to the Allpoints

9    case we cited, which is 259 B.R. 824.

10          THE COURT:  I have it.

11          MR. MILLER:  Which is really an interesting situation,

12   Your Honor, because the trustee, Mr. Burtch, was the trustee in

13   the Allpoints case.

14          THE COURT:  He's been around for a while.

15          MR. MILLER:  And in that case Mr. Burtch raised

16   claims, as a trustee, for breach of fiduciary duty and other

17   things against people associated with debtor.  And the court

18   granted summary judgment against him for, among other things,

19   the statute of limitations.

20          Now, Eugenia didn't really spend any time addressing

21   this during its argument, Your Honor.  Maybe they would say

22   that they didn't actually learn of the facts until discovery

23   took place in the underlying litigation, something of that

24   nature.  I don't think there's any basis for that but to the

25   extent that Eugenia were to make such an argument, the All

1     Points court already addressed that.  Because in footnote 4 in

2     the All Points case, at page 829, the court said, "Although

3     plaintiff at bar knows more about the 1990 transactions in this

4     proceeding," which were the subject of the litigation there.

5          THE COURT:  Right.

6          MR. MILLER:  "Than Continental did when it filed the

7     New Jersey litigation in November 1990," which was the

8     preceding litigation, similar to what we have here,

9     "nevertheless, Continental's knowledge in November 1990 was

10    legally sufficient to allege fraud against these defendants and

11    therefore must be deemed sufficient for statute of limitations

12    purposes".

13          Your Honor, that exact same circumstance is what Your

14    Honor sees here today before you.  Just like in Allpoints there

15    was an earlier lawsuit that was filed, just like in Allpoints

16    there's an attempt in a bankruptcy proceeding to bring the same

17    claims more than three years after inquiry notice was found.

18    Just like in Allpoints, Your Honor can conclude that Eugenia

19    was on inquiry notice in May of 2005 and therefore the claims

20    are barred by the statute of limitations.

21          So we think, Your Honor, that that is the simplest and

22    easiest way to dispose of this case, if Your Honor believes you

23    must reach the colorable claim issue, which as I pointed out,

24    unless you conclude there's no authority for Eugenia to bring

25    these claims, we believe that Your Honor does need to reach

Page 31

1    those issues.

2         The second issue is collateral estopple.  This is

3    obviously a more complex issue than the statute of limitations.

4    But we believe that under these facts there's ample ground for

5    a Rule 12(b)(6) type analysis to conclude that there's no merit

6    to Eugenia's claims.

7         And the reason -- we had a lot in our papers but I'll

8    try to make it as simple as I can, Your Honor.

9         THE COURT:  Okay.

10        MR. MILLER:  In the underlying federal litigation

11   where Eugenia lost, that was a derivative case on behalf of AMC

12   Computer.

13        THE COURT:  Right.

14        MR. MILLER:  The debtors' sole asset estopped in AMC

15   Computer.  In the underlying case the court found that there

16   could be no breach of fiduciary duty claim against the

17   directors of AMC Computer because there was no harm to AMC

18   Computer.

19        Now Your Honor, by definition in this proposed action,

20   which is really a double derivative action, if there was no

21   harm to the underlying corporation, which the Court already

22   found in a case brought by Eugenia so you have strict privity,

23   there could be no harm to the stock owned by AMC investors, the

24   debtors, and therefore no derivative claim for breach of

25   fiduciary duty could be brought here.

1       I know I went through that kind of fast but does that

2   make sense to Your Honor?

3       THE COURT:  Yeah.  I mean, I understand it and I

4   did -- and I read your papers a couple times so I think I

5   understand the argument.  I guess the issue that I would

6   struggle with in the context of res judicata -- collateral

7   estopple is have I had, and I'll be candid, have I had a

8   sufficient opportunity to compare, because I think that's the

9   analysis that's called upon for the Court, to compare what it

10  is that's been fought over previously and is it functionally

11  precluded, at this date, because it's already been disposed of,

12  same parties.  And I agree, you do have same -- I believe you

13  have same parties.

14      MR. MILLER:  We do.

15      THE COURT:  But I mean, I actually drew a little flow

16  chart to make sure I understood who's on first.

17      MR. MILLER:  It's the same plaintiff in the federal

18  case, Your Honor.  That's correct.

19      THE COURT:  Yeah.  Okay.  So I do think I understand

20  that.

21      MR. MILLER:  I believe that Your Honor does have

22  sufficient information to rule on the collateral estopple for

23  the reason I outlined already, which is you needn't look no

24  further than the court's conclusion in the underlying case on

25  the breach of fiduciary duty claims, that there was no harm to

1    AMC Computer Corp.  And then Your Honor only needs to compare

2    that to paragraph 91 of Eugenia's proposed adversary complaint.

3            THE COURT:  Right.

4            MR. MILLER:  I'll give Your Honor a minute to find

5    that.

6        (Pause)

7            THE COURT:  Okay.  I'm there.

8            MR. MILLER:  Where Eugenia alleges "As a direct and

9    proximate result of defendant's acts and omissions the debtors

10   were injured and damaged by the loss of their 28.5 million

11   dollar investment in AMC as the value of the debtors' stock in

12   AMC was depleted by virtue of AMC's insolvency."

13           That is exactly what the federal court addressed on

14   the breach of fiduciary duty claims, that there was no harm to

15   the stock of AMC Computer.

16           THE COURT:  Okay.

17           MR. MILLER:  Unless Your Honor has any other

18   questions, I won't spend any time in the in pari delicto issues

19   but to rely on the papers for those.

20           THE COURT:  Okay.

21           MR. MILLER:  In conclusion, I think that it's clear

22   that Cybergenics does not apply in a Chapter 7 case.  I think

23   Your Honor would be breaking new ground if you were to rule

24   that it does.  And even if Your Honor were inclined to break

25   that new ground, there's certainly no reason to do it under

AMC INVESTORS, LLC

1    these facts where these issues have already been litigated and

2    Eugenia has lost and there is a Chapter 7 trustee in place who,

3    if Eugenia were to pay him to investigate these claims, he's

4    more than capable of deciding and prosecuting them on his own,

5    without the conflicts of interest that Eugenia would suffer

6    from if it were to bring these claims.

7              THE COURT:  Okay.

8              MR. MILLER:  Thank you.

9              THE COURT:  Thank you.  Mr. Burtch, did you have

10   anything to add, sir, or your counsel?

11             MR. BURTCH:  No.

12             THE COURT:  Very well.  Mr. Karlan, do you wish to

13   respond?

14             MR. KARLAN:  Just very briefly, Your Honor.

15             First on the issue of breaking new ground.  The only

16   courts of appeals that have ever addressed the question of

17   whether Cybergenics applies in a 7 as well as in an 11 have

18   ruled that it does.  So I don't know that Your Honor would be

19   breaking anything.

20             With respect to the collateral estopple point that Mr.

21   Miller made, and I have the greatest respect for him and I say

22   this respectfully, he said that is exactly what the court in

23   the New York proceeding held.  It is not remotely what the

24   court in the New York proceeding held.  It's just not even --

25   it's just not even close.

1          The fact in this case that is the only fact at the end

2     of the day that I think that matters, is that Eugenia has a

3     judgment against these debtors which judgment was obtained

4     after trial, with full evidence.  So when Mr. Miller takes his

5     good natured teases at me and says that I've lost every step of

6     the way, I have to wonder what that judgment is supposed to

7     represent.  The judgment was against the debtors, not against

8     the computer company.  It's the judgment that is the principal

9     portion of -- that the claim that Eugenia has in this 7.  And

10    that judgment should be paid -- not that judgment, the

11    liability created by that judgment should be paid by these

12    adversary complaint defendants into the estate so that the

13    estate's creditors can be made whole.

14          Also Your Honor, on the collateral estopple point, and

15    this is also relevant with respect to the statute of

16    limitations point, we do not have the same parties here, we

17    just don't.  Eugenia is a derivative -- in the prospective

18    adversary complaint Eugenia is -- would be a derivative

19    plaintiff suing derivatively on behalf of the guarantors, the

20    debtors.  In the New York litigation it was suing either on its

21    own behalf or, in one claim, derivatively on behalf of the

22    computer company.  We do not have the same plaintiffs here.

23          And then finally Your Honor, with respect to the

24    statute of limitations, I just -- I would remind Your Honor

25    that the judgment against the debtors in the state court action

Page 36

1    was obtained quite close in time, before the filing of this

2    bankruptcy case.  And that is, in our view, the triggering

3    event that creates -- that starts the running of the statute of

4    limitations for any claim by the guarantors against Mr. Glazer,

5    Mr. Rial and the others.

6            Thank you, Your Honor.

7            THE COURT:  All right.  Thank you.  All right.  Okay.

8    I'm going to need just a couple minutes to organize my notes

9    and I will return and rule.  All right.  Thanks very much,

10   counselor.

11        (Recess from 2:58 p.m. until 3:13 p.m.)

12           THE COURT:  Thanks.  The matter before the Court is

13   the request of Eugenia for derivative standing and before I

14   rule on the motion I would make an observation that I've made

15   at other times but I just have to say one of the real pleasures

16   of this job is able counsel arguing interesting and sometimes

17   novel questions.  And for that I appreciate the quality of the

18   briefing, even on an expedited basis, and particularly the

19   quality of the argument today.

20           I will -- I have reviewed all of the papers and the

21   attachments and other submissions.  I have also heard argument.

22   For the reasons that I will state, I'm prepared to grant the

23   motion.

24           The standard for the grant of derivative standing is

25   not in material dispute today.  Under the Cybergenics case the

```
 1   movant must demonstrate that it possess a -- wishes to pursue a
 2   colorable claim, that the trustee has failed to pursue that
 3   claim and that leave of the bankruptcy court has been obtained
 4   to pursue the claim.
 5            I will start with the threshold proposition which I'm
 6   really intrigued by, and I appreciate the argument, again, from
 7   counsel on the issue.  It is a much more significant or complex
 8   question than I would have originally assessed, but I am
 9   satisfied that Cybergenics is not limited to Chapter 11 cases
10   and I've carefully read both Cybergenics as well as the cases
11   cited to me by the parties, particularly the Cooper and Hannah
12   cases.
13            I have construed and applied the Cybergenics case in
14   Chapter 11 cases on numerous occasions.  And I've also given
15   serious consideration to the debtors' argument that it doesn't
16   apply in Chapter 7.  And while I will acknowledge that the
17   uniform existence of a trustee in Chapter 7 cases may give rise
18   to what I think is fairly described as a more stringent
19   application of the standard, I don't believe that the existence
20   of the Chapter 7 trustee precludes derivative standing for a
21   creditor.
22            And I will further note that I have carefully reviewed
23   both the Cooper and Hannah cases, which I note -- and I'd note
24   that Judge Jernigan, at page 815 of the Cooper case, having
25   rejected the proposition would, at least observed, I think
```

Page 38

```
 1    consistent with my comments today, that if indeed derivative
 2    standing can occur under Chapter 7, that it would require a
 3    substantial showing and I think that it does require more
 4    stringent standard and application.
 5            And so, I am satisfied that actually the concept of
 6    derivative standing is not precluded by Cybergenics and that it
 7    can in fact serve a particularly valuable and functional
 8    purpose in Chapter 7 cases where, for example, as here the
 9    Chapter 7 trustee and the estate lacks sufficient funds to
10    pursue a stated cause of action.
11            Applying the test under Cybergenics, part one is
12    colorable claim and I will return to that.  The second element
13    is failure of the trustee to pursue or consent by the trustee,
14    and I think here we've met both of those constructions.  First,
15    the trustee has candidly stated in his submission that the
16    estate lacks the money to pursue the claim.  Second, I read the
17    trustee's response to constitute consent to pursuit of the
18    litigation.
19            Now as to colorable claim, obviously the third element
20    is bankruptcy court approval and as noted I am prepared to
21    grant the motion.  As to colorable claim, I'm satisfied that
22    the movant here has demonstrated that it wishes to pursue a
23    colorable claim.  The debtors have made, frankly, strong
24    arguments that these claims fail right out of the box, either
25    due to statute of limitations issues, due to collateral
```

1    estopple and/or due to application of the doctrine of in pari

2    delicto, each of which I would regard as affirmative defenses.

3    And I want to be clear that my ruling today granting derivative

4    standing and permitting the prosecution of this litigation or

5    the commencement of the litigation is not and should not be

6    construed, in any respect, as a commentary or pre-assessment on

7    the merits of these defenses identified by the debtors.

8             I fully expect that these arguments will be the

9    subject of robust, dispositive motion practice either under

10   Rule 12(b) or under Rule 56 in the very near future.  And it

11   may be that this litigation will have a prompt end, as the

12   debtors have predicted.

13            But I'm not satisfied today that the record before the

14   Court is sufficient to allow me to completely bar the

15   opportunity to present those claims and I'm further satisfied

16   that the claims have been identified in a sufficiently

17   colorable framework that I am prepared to grant Eugenia's

18   motion.

19            Mr. Ramos or Mr. Karlan, do you have a form of order

20   today?

21            MR. RAMOS:  Your Honor, we do have a form of order.

22   It is the form that actually we submitted with the motion.  I

23   note that the trustee had some suggestions or concerns

24   regarding the form of order.

25            THE COURT:  You know, where do you stand with that?

AMC INVESTORS, LLC

1    Have you had an opportunity to have discussions with the

2    trustee on that?

3            MR. KARLAN:  Your Honor, I haven't.  There were four,

4    as I recall them.

5            THE COURT:  There were four separate points.

6            MR. KARLAN:  The first three are no problem at all.

7            THE COURT:  The fourth is indemnification.

8            MR. KARLAN:  It is and I haven't spoken to the client

9    about it.

10           THE COURT:  Why don't we do this; you have my ruling.

11   I'd like to give you, and particularly Mr. Burtch, the

12   opportunity to have a discussion.  I can understand why you

13   didn't have a big back and forth on that question prior to the

14   Court ruling.  And if there are issues you can get me on the

15   phone but if you can settle on a form of order and I'd ask,

16   obviously, that you run it past counsel for the debtors as

17   well, Mr. Miller and Ms. Sawczuk, then I'll entertain it under

18   COC and if there are issues you can get me on the phone, okay?

19           MR. KARLAN:  Thank you.

20           THE COURT:  Mr. Miller?

21           MR. MILLER:  Your Honor, I need to discuss this with

22   our client but I suspect that we may wish to appeal this.

23           THE COURT:  I understand.

24           MR. MILLER:  So could Your Honor put in a place a stay

25   of the litigation once its filed, for some period of time, in

Page 41

1    order to allow us to appeal this decision so that we're not

2    needlessly dealing with discovery and other activities?

3            THE COURT:  Let me ask you a question, Mr. Karlan, and

4    I think this goes to a point that you made from the podium

5    about twenty minutes ago, and that is that the biggest issue

6    and the reason that we're here is because you allege that you

7    have exposure on a statute of limitations.  Mr. Miller suggests

8    he already does but we'll let somebody else sort that out.  Any

9    issue with a stay?  You need to get your complaint on file in

10   order to, if you're right, preserve your statute.

11           MR. KARLAN:  Couple things.

12           THE COURT:  Sure.

13           MR. KARLAN:  First, Judge, we will -- I would like to

14   file the complaint -- I want to fix a few things that I

15   encountered in the draft and deal with some of the points that

16   Mr. Miller has raised, but we'll get that on file before the

17   statute -- before we believe the statute runs.  And if I'm not

18   being too forward here, who will have that matter?

19           THE COURT:  I would expect initially that -- well, I

20   would expect that the case itself would remain with Judge

21   Sontchi.  If there are issues in the near term, I would

22   presumably deal with them and I'd be happy to do so.  But I

23   think the question is really if you were to file your complaint

24   then, you know, the rules kick in, you've got service, you'll

25   have a Rule 26 conference, et cetera, et cetera, et cetra.

AMC INVESTORS, LLC

1          MR. KARLAN:  Right.

2          THE COURT:  All of which is actually, you know, weeks

3     or months out.  So it would seem to me --

4          MR. KARLAN:  No stay is necessary, that sort of thing.

5          THE COURT:  Well, I don't know if I would say that no

6     stay is necessary.  I would be favorably disposed to a stay,

7     I'm not certain that we really need it right now.  And I'd be

8     happy to let the parties agree to some sort of tolling

9     agreement.

10          My main thing -- my main concern is that -- that to

11     the extent that you have a statute that you want to survive

12     under, notwithstanding the arguments, that you be able to

13     survive.  But if indeed there's a request for the opportunity

14     to take an appeal, this is a litigation that's going to go on

15     for a little while, one way or the other.

16          MR. KARLAN:  Oh sure.  All I was saying was I can

17     envision a lot of ways to skin this cat.  There isn't going to

18     be any big discovery in this case any time soon.

19          THE COURT:  Right.

20          MR. KARLAN:  We're not allowed to take any discovery

21     until we have a discovery plan in place.

22          THE COURT:  Well why don't we do this; you're going to

23     settle on a form of order --

24          MR. KARLAN:  Yeah.

25          THE COURT:  -- I will tell you that I've favorably

Page 43

1    disposed to either some sort of consensual arrangement or an

2    acknowledgement that very little activity is going to happen.

3    I mean, if there's filing and if there's service of the

4    complaint, subject to the appeal and everything else, with all

5    of those rights being fully preserved, if the parties can

6    memorialize that, that would be fine.  If that becomes an issue

7    in dispute, understanding that my goal is to get the complaint

8    on file and not much more --

9            MR. KARLAN:  Let me make this offer, maybe this is

10   good enough, I'm thinking, off the top of my head here, that

11   Mr. Miller is going to need leave of court to take an appeal

12   here, maybe I'm wrong about that.

13           THE COURT:  I don't know the answer to that.

14           MR. KARLAN:  I don't know the answer to that either.

15   Okay.  So --

16           THE COURT:  You guys are coming up with all kinds of

17   new stuff.

18           MR. KARLAN:  I know.  If I'm right that this is not a

19   final order and that he needs leave of court to take the

20   appeal, if he gets that leave of court I'm perfectly happy to

21   extend, indefinitely, his time to answer the complaint so that

22   that appeal can get itself played out.

23           I think I probably will oppose any application for

24   leave to appeal, however.

25           THE COURT:  Sure.  I'm not -- I don't think that's

Page 44

1    what he's asking.  What he's basically saying is I don't want

2    to have to brawl in the complaint, you can get your complaint

3    on file and that makes sense to me.  And I do think that, just

4    as you said, I don't think anything is likely to happen very

5    soon but you guys are litigators, I'm not.  There may be stuff

6    that you need to do but it's not my intention, again, if you

7    wish to exercise appellate rights you're welcome to do so.  So

8    I think we can thread that needle somehow and maybe we can

9    memorialize that in the form of order, at least in the near

10   term, so that the complaint gets on file, rights are preserved.

11            If there's motion practice relating to an

12   interlocutory appeal, you got me.  I look forward to it.  I

13   don't know the answer to that question.  So -- but I think if

14   you can memorialize that, at least for the near term, in the

15   form of order, that might be ideal.  Okay?

16            MR. KARLAN:  Yes.

17            THE COURT:  All right.  Do we have anything further

18   today?

19        (No response)

20            THE COURT:  Again, thanks very much, counsel.  Have a

21   good day.

22            IN UNISON:  Thank you, Your Honor.

23

24   (Whereupon these proceedings were concluded at 3:23 PM)

25

Page 45

1

2                          **I N D E X**

3

4                          RULINGS

5                                        Page      Line

6    Motion of Eugenia for Derivative Standing,    36        13

7    Granted

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T I O N

3

4    I, Pnina Eilberg, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8    _____

9    PNINA EILBERG

10   AAERT Certified Electronic Transcriber CET**D 488

11

12   Veritext

13   200 Old Country Road

14   Suite 580

15   Mineola, NY 11501

16

17   Date:  June 2, 2011

18

19

20

21

22

23

24

25